**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JOHN DOE 1, et al.,

      Plaintiffs,

v.                                    Case No. 13-14356

MICHIGAN DEPARTMENT OF
CORRECTIONS, et al.,

      Defendants.

_____/

**OPINION AND ORDER: (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND MOTION TO
DISMISS, (2) GRANTING PLAINTIFFS' RENEWED MOTION FOR A PROTECTIVE
ORDER, AND (3) DENYING DEFENDANTS' MOTION FOR A MORE DEFINITE
STATEMENT**

**I. INTRODUCTION**

Plaintiffs John Does 1–7 filed the instant action alleging that while they were

juveniles in Michigan's correctional system, Defendants improperly housed them with

adult inmates. As a result, Plaintiffs claim that adult inmates physically and sexually

harassed and assaulted them. Plaintiffs also allege that correctional officers allowed

this abuse to occur, and sometimes participated in the sexual abuse and harassment of

juvenile prisoners. Following their answer to Plaintiffs' complaint, but before any

discovery commenced, Defendants moved for summary judgment and to dismiss Count

V of Plaintiffs' complaint, as well as for a more definite statement of Plaintiffs'

allegations. Plaintiffs in turn moved for a protective order allowing them to proceed

pseudonymously. These matters are fully briefed, and no hearing is needed. *See* E.D.

Mich. LR 7.1(f)(2). For the following reasons, Defendants' motion for summary

judgment will be denied, their motion to dismiss will be granted, and their motion for a more definite statement will be denied.   Plaintiffs' motion for a protective order will be granted.

Before the court addresses the merits of this case, a few comments are in order concerning the behavior of counsel for both parties.

## II.  CONDUCT OF COUNSEL

"An attorney's conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms." – *Preamble,* Civility Principles, United States District Court for the Eastern District of Michigan.

The court has held several on and off-the-record status conferences, in which the court has endeavored to encourage reasonable agreement between the parties on threshold issues. Counsel for both parties, however, seem unable (or unwilling) to communicate with each other in good faith.  This has led to the court striking several motions from the docket for failure to comply with E.D. Mich. Local R. 7.1(a), a rule that is designed to encourage counsel to meet, confer, and reach reasonable agreements on issues that will expedite the case.   Counsel on both sides are, in the court's view, excessively adversarial, and have sadly neglected "personal courtesy and professional integrity in the fullest sense of those terms."  This attitude of counsel is longstanding, and most recently illustrated in the briefing surrounding Defendants' motion for a more definite statement.  In this briefing, Defendants argue that "Plaintiffs' counsels' arrogance bordered on contempt for the Court;" and Plaintiffs reply that this statement "border[s] on defamation."  Such juvenile hyperbole serves only to cast both sides in a poor light, tarnish the appearance of professional competence, and cloud, rather than

2

illuminate, the issues.  It is sad to contemplate counsel thinking that this judge might be impressed or swayed by statements such as these.

This case presents serious allegations against Defendants; the central contentions are inflammatory, or at least potentially so, and the implications important. The court nevertheless expects counsel to live up to the oath they each took as a condition of being admitted to practice before this bench, and to behave in a professional and rational manner.  Continuing unprofessional behavior, including unreasonable withholding of consent, may result in the imposition of appropriate sanctions.

### III.  BACKGROUND

Plaintiffs allege that, prior to reaching the age of majority, they were improperly housed with adult prisoners in the Michigan Correctional System.  Plaintiffs claim that they were cell mates with adult prisoners, and were forced to eat, shower, recreate, and work with adult prisoners.  These encounters placed Plaintiffs at an increased risk for sexual harassment and assault, including from Michigan Department of Corrections ("MDOC") officers who often turned a blind eye to the harassment and assaults. Plaintiffs also allege that Defendants' policy of housing youthful prisoners with adults "created a prison environment that facilitates a system of sexual trafficking of youth." (Dkt. # 1, Pg. ID 13.)  As a result of Defendants' alleged policy, Plaintiffs suffered physical injuries, sexual violence and abuse, and severe emotional and mental trauma. Currently, there are seven named "John Doe" Plaintiffs, whom the court has thus far allowed to proceed pseudonymously due to concerns regarding their safety in the Michigan Correctional System.  Each of their individual allegations are summarized

3

below.

At the age of 17, Doe 1 entered Michigan's Richard A. Handlon Correctional
Facility, where he was housed with an adult prisoner.  Throughout the spring and
summer of 2012, he alleges that he was repeatedly anally and orally raped by
numerous adult male prisoners, including his adult cell mate who Doe 1 claims engaged
in selling "access" to him to other adult prisoners.  Doe 1 further alleges that MDOC
staff were aware of his cell mate's activities, and all of his attempts to get help were
rejected by MDOC personnel.  Following the alleged assaults, MDOC transferred Doe 1
to a new correctional facility, where he was placed in solitary confinement.  (*Id.* at  Pg.
ID 15–16.)

Doe 2 has been incarcerated in an adult correctional facility since he was 16
years old.  Shortly after he arrived at the Thumb Correctional Facility, he claims that he
was brutally beaten and raped by his adult cell mate.  Despite being treated by MDOC
personnel for rectal bleeding, Doe 2 claims he was placed back in the same cell as his
assailant.  Doe 2 also alleges that MDOC personnel opened Doe 2's cell so that an
adult prisoner could assault him.  When he was transferred to the Oaks Correctional
Facility, MDOC placed him with another adult prisoner who subjected him to further
inappropriate physical conduct.   As a result of reporting the incident, he claims he
issued a misconduct ticket and sent to solitary confinement.  Since his release from
solitary confinement, Doe 2 claims he has been physically assaulted and marked on his
face with a blade, which the complaint alleges makes him a target for other prisoners.
(*Id.*, at Pg. ID 17–18.)

Doe 3 has also been incarcerated since he was 16 years old, and MDOC initially

4

housed him in a facility surrounded by adult prisoners, who allegedly sexually harassed and threatened him.  When Doe 3 was transferred to the Thumb Correctional Facility, he claims adult prisoners raped and sexually abused him on at least three occasions. Additionally, Doe 3 alleges that female MDOC staff members grabbed and pulled on his genitals, sexually harassing him during body searches and while he was showering and using the bathroom.  According to Doe 3, MDOC personnel told him that he was going to be raped, and that they would facilitate rape as punishment for any complaints.  (*Id.* at Pg. ID 18–20.)

Doe 4 also claims that he was abused by female MDOC staff members.  He has been incarcerated at the Thumb Correctional Facility since he was 16, and claims that from late 2012 to early 2013, a female MDOC staff member repeatedly opened his cell for the purpose of raping him and that she also coerced sexual intercourse with him in a cleaning closet.  Doe 4 repeats similar allegations as Doe 3 concerning sexual harassment and tugging on his genitals by female MDOC personnel.  (*Id.* at Pg. ID 20–21.)

The Thumb Correctional Facility female staff also harassed and groped Doe 5. He claims that his adult cell mate physically assaulted and anally raped him, as well as sold him to other adult male prisoners for sexual encounters.  The complaint further states that MDOC staff were aware of this sexual trafficking, but failed to discipline the adult offenders, intervene with protective custody, or separate him from the adult prisoners.  When Doe 5 was transferred to the Carson City Correctional Facility, he claims that other adult inmates sexually abused, assaulted, and raped him in a shower. (*Id.*, Pg. ID 21–23.)

5

Doe 6 alleges that he was also housed with adult inmates.  He claims that he was repeatedly sexually harassed, and despite reporting his fears to MDOC, he was transferred to the Gus Harrison Correctional Facility where an adult prisoner raped him in the laundry room.  Following Doe 6's report to prison authorities, he alleges that he was transferred to another correctional facility where he has been housed for over five months in solitary confinement.  He claims that the harassment has not stopped, and that he is threatened and told that he will be sold for sex on the prison yard.  Doe 6 refuses to leave solitary confinement because of his fear of additional rapes.  (*Id.*, Pg. ID 23–24.)

Doe 7 was incarcerated as a minor throughout the summer of 2013.  Despite acknowledging that he was vulnerable to sexual assaults, the complaint alleges that MDOC staff took no action to protect him.  Doe 7 claims that an adult male prisoner subsequently entered Doe 7's cell and assaulted him.  (*Id.*, Pg. ID 24–25.)

Defendants deny almost all of Plaintiffs' claims.  They state that under-age prisoners are not housed with adults, and that adult housing is physically separate from prisoners who are under 18 years of age.  Regarding the individual Doe Plaintiffs' allegations, Defendants state that they can neither admit or deny the allegations because the identity of each Doe Plaintiff has not yet been revealed.  Defendants also deny having any knowledge that youthful prisoners are subjected to a heightened and substantial risk of physical and sexual violence, stating instead that "a prisoner's vulnerability to another prisoner is more a function of the prisoner's attitude and deportment and behavior, than it is strictly of age."  (Dkt. # 36, Pg. ID 252.)

6

## IV.  STANDARD

Defendants ask that the court grant them summary judgment on Plaintiffs' claim for prospective injunctive relief and that it dismiss Plaintiffs' international law claim.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  The movant has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment, therefore, is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In contrast, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's allegations.  The court views the complaint in the light most favorable to the plaintiff and takes all well-pleaded factual allegations as true.  *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).

## V.  DISCUSSION

7

### A. Plaintiffs' Claims for Prospective Injunctive Relief

Defendants seek summary judgment on Plaintiffs' claims for prospective injunctive relief, arguing that Plaintiffs lack standing and that Defendants have already changed their policy in accordance with the injunctive relief Plaintiffs seek, rendering Plaintiffs' claims moot.

### 1. Standing

Defendants argue that because all Plaintiffs have now reached the age of majority, none of them currently have standing to challenge MDOC's practices for housing youthful prisoners.

Defendants rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for this argument.  In *Lyons*, the plaintiff sought injunctive relief against Los Angeles after four police officers pulled him over and placed him in a chokehold, allegedly without provocation.  *Id.* at 97–98.  The Supreme Court found that the plaintiff lacked standing to seek an injunction barring Los Angeles from using chokeholds, reasoning that it was "surely no more than speculation to assert either that [the plaintiff] himself will again be involved in one of these unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold."  *Id.* at 108.  Because the *Lyons* plaintiff failed to demonstrate a sufficient likelihood that he would again be injured by the Los Angeles police, he was not entitled to pursue equitable relief.  *Id.* at 111.  In the instant case, Defendants argue that, like the plaintiff in *Lyons*, Plaintiffs are unable to show any likelihood of future injury resulting from being youth improperly housed with adult prisoners because Plaintiffs are now adults, and are thus properly housed in the adult correctional system.

8

As Plaintiffs respond, Defendants' argument is misplaced. "Standing to bring suit must be determined at the time the complaint is filed," *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011), and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Defendants do not present any evidence contesting Plaintiffs' allegations that John Doe 4 and 7 were minors at the time Plaintiffs filed this action. (Dkt. # 1, Pg. ID 20, 24.) Further, the Sixth Circuit has declined to apply *Lyons* in situations where, as here, a plaintiff class alleges a realistic and non-speculative threat of future injury. *See Ramirez v. Webb*, 787 F.2d 592, 592 (6th Cir. 1986) (per curiam). Defendants presumably agree, given that they make no attempt to distinguish this authority in their reply. Plaintiffs have standing to seek injunctive relief.

## 2. Mootness

Defendants argue that summary judgment should be granted in their favor on Plaintiffs' claim for injunctive relief in the form of an order mandating the separation of under-age and adult prisoners.[1] Defendants assert that because they no longer house

---

[1] There appears to be some confusion regarding whether Defendants also moved for summary judgment on *all* of Plaintiffs' claims for injunctive relief, or whether they only moved for summary judgment on Plaintiffs' claim for an injunction mandating prisoner separation. Plaintiffs (and the United States, through a Statement of Interest) correctly note that Plaintiffs' requests for injunctive relief are not limited to an order mandating the separation of juvenile prisoners from adults. Rather, they also seek injunctive relief barring defendants from further constitutional, statutory, and common law violations, as well as mandating "adequate medical and mental health treatment to remediate the ongoing harm" to Plaintiffs.

Although Defendants originally argued that a decision in their favor on the request for injunctive relief mandating juvenile/adult separation would mandate dismissal of *all* of Plaintiffs' injunctive relief claims, (Dkt. # 47, Pg. ID 379) they change

juvenile prisoners with adults, Plaintiffs' request for injunctive relief is moot.  "A case is moot when the issues presented are no longer live or when the parties lack a legally cognizable interest [personal stake] in the outcome." *Banas v. Dempsey*, 742 F.2d 277, 281 (6th Cir. 1984) (citation omitted, brackets in original).

Congress enacted the Prison Rape Elimination Act of 2003, ("PREA"), in order to address the high incidence of sexual assault within prisons.  As part of the PREA, Congress found that "at least 13 percent of the inmates in the United States have been sexually assaulted in prison," with juveniles being more than five times as likely as adults to be sexually assaulted in adult facilities.  42 U.S.C. § 15601(2), (4).  Congress directed the Department of Justice to publish a "final rule adopting national standard for the detection, prevention, reduction, and punishment of prison rape."  *Id.* at § 15607(a)(1).  The PREA further states that if a state fails to certify that it has adopted the national standard, its federal funding will be reduced by five percent per year.  *Id.* at § 15607(e)(2).

Pursuant to this directive, the Department of Justice promulgated the following rule:

> (a) A youthful inmate shall not be placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate through use of a shared dayroom or other common space, shower area, or sleeping quarters.
>
> (b) In areas outside of housing united, agencies shall either:

---

course in their reply and clarify that "[insofar] as the Plaintiffs seek other forms of injunctive relief, the Defendants will address those issues in subsequent motions."  (Dkt. # 76, Pg. ID 1251.)  Given this change in position, the court will only address whether Plaintiff's request for an injunction mandating juvenile/adult prisoner separation is moot.

>    (1) Maintain sight and sound separation between youthful
>    inmates and adult inmates, or
>
>    (2) Provide direct staff supervision when youthful inmates and
>    adult inmates have sight, sound, or physical contact.
>
>    (c) Agencies shall make best efforts to avoid placing youthful inmates in
>    isolation to comply with this provision.   Absent exigent circumstances,
>    agencies shall not deny youthful inmates daily large-muscle exercise and any
>    legally required special education services to comply with this provision.
>    Youthful inmates shall also have access to other programs and work
>    opportunities to the extent possible.

28 C.F.R. § 115.14.  For the purposes of this rule, "youthful inmate" "means any person

under the age of 18 who is under adult court supervision and incarcerated or detained in

a prison or jail."  *Id.* at § 115.5.

Defendants argue that given their change in housing policy to comply with the

PREA, Plaintiffs' request for an injunction mandating separate housing for juvenile and

adult offenders is moot.  Defendants assert that the PREA only applies to federal

prisons, but that Michigan "has elected to voluntarily emulate the PREA national

standards."  (Dkt. # 47, Pg. ID 361.)  Prior to the PREA's effective date, Defendants

claim that Michigan housed all its prisoners who were under 17-years-old with prisoners

of the same age.  Juvenile prisoners who were 17-years-old were housed with adult

prisoners, pursuant to Michigan law.  Mich. Comp. Laws § 750.139.

Defendants claim that as of August 15, 2013, there are only three correctional

facilities in Michigan where juvenile prisoners are held, and juvenile prisoners are no

longer housed with adults in any of the facilities.  The correctional facilities which house

juvenile prisoners are: the Egeler Reception and Guidance Center in Jackson ("RGC");

the Thumb Correctional Facility in Lapeer ("TCF"); and the Woodland Center

11

Correctional Facility in Whitmore Lake ("WCC").  TCF is the primary correctional facility where juvenile prisoners are housed.  Defendants argue that all juvenile prisoners at TCF are housed in a separate housing unit from the other correctional units, that the juvenile prisoners do not have any physical contact with adult prisoners, and that the only proximity they have with adult prisoners occurs "while walking to school, afternoon or evening meals, recreation activities, religious services, visits, health care, or the library," but that while these movements are occurring, the juvenile inmates are under direct staff supervision at all times.  (Dkt. # 47-5, Pg. ID 413; Dkt. # 47-4, Pg. ID 407.) RGC is used as an intake institution where juvenile prisoners are placed in quarantine once they are sentenced so that prison officials can conduct a physical and mental examination, review the individual prisoner's criminal history, education and risk profile, and place them within the MDOC system.  (Dkt. # 47-3, Pg. ID 397.)  Juvenile prisoners are also processed through the RGC, although their stay is usually expedited to only one week and there is a meshed fence with a locked gate separating the four cells used for juveniles at RGC from the rest of the adult population.  (*Id.* at Pg. ID 398.)  Juvenile prisoners are rarely placed in WCC, which is the MDOC facility used for short-term mental health crisis stabilization.  (Dkt. 47-6, Pg. ID 418.)  When juvenile prisoners require short-term mental health treatment, they are placed in their own cell, and whenever they are moved from their cell, they are under direct staff supervision.  (*Id.* at Pg. ID 419–20.)

Plaintiffs argue that Defendants' voluntary change of their prison housing practices does not moot Plaintiffs' request for injunctive relief.  As the Sixth Circuit explains:

12

> 'A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case.'   Instead, the defendant bears 'the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'

*Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir. 2012) (quoting

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167,

174, 190 (2000)) (internal citations omitted).   Plaintiffs point out that in their motion for

summary judgment, Defendants characterize their compliance with the PREA as

"voluntary,"[2] and further argue that the PREA only applies to federal prisoners.   (*See*

Dkt. # 47, Pg ID 361.)   By these assertions, Defendants' continued compliance is

discretionary and subject to change.

Defendants change course in their reply, conceding that although their

compliance with the PREA is voluntary, and therefore generally insufficient to moot

Plaintiffs' claim for injunctive relief, as government officials they are entitled to "more

solicitude" than private parties are.   *See League of Women Voters of Ohio v. Brunner*,

548 F.3d 463, 473–74 (6th Cir. 2008).   This may be true, but Defendants have still not

met their "formidable burden" of demonstrating that Plaintiffs' claim is moot.   Michigan

---

[2] The United States filed a Statement of Interest clarifying that the PREA applies with equal force to both state and federal prisons, and disputing Defendants' characterization of Plaintiffs' request for injunctive relief as moot.   Although the United States is correct that the PREA standards apply to state correctional systems, nowhere does it appear that state compliance is mandatory.   Rather, states may choose whether to certify their full compliance with the PREA's national standards, or assure the government that it is using 5% of the federal funds it receives to achieve full compliance.   42 U.S.C. § 15607(e)(2).   A failure to adopt either course of action reduces a state's funding for prison purposes by 5% for each fiscal year it is non-compliant.   *Id.* Although the court has no doubt that a 5% reduction in federal funding has bite, states appear free to choose whether to comply with the PREA and receive this funding, or ignore it and face cuts in their budgets.   Thus, Michigan appears to be correct in characterizing its compliance with the PREA as "voluntary."

law still allows 17-year-old prisoners to be housed with adults, which if carried out would be in conflict with the PREA.  *Compare* Mich. Comp. Laws § 750.139 *with* 28 C.F.R. §§ 115.5, 115.14.  Although Defendants argue that such a practice has been abandoned, the fact remains that it is still permissible pursuant to state law, and, as such, subject to change.  Accordingly, the court cannot find that Plaintiffs' have met the heavy burden of proving moot Plaintiffs' request for an order mandating the separation of juvenile and adult prisoners.

## B.  Plaintiffs' International Law Claim (Count V)

Defendants move to dismiss Plaintiffs' claim that Defendants' conduct violated their rights under various treaties, including the American Declaration of the Rights and Duties of Man ("the American Declaration), the International Covenant on Civil and Political Rights ("ICCPR"), and the United Nations Convention on the Rights of the Child ("CRC"), and that Defendants' conduct also violated "customary international law." Defendants argue that alleged violations of these treaties and customs are not cognizable under 42 U.S.C. § 1983.[3]

---

[3] Defendants' citations to Wikipedia in support of various arguments are numerous but less than convincing.  Federal courts across the nation have continually recognized that Wikipedia's reliability is doubtful, given that by its own statement, "Anyone with Internet access can write and make changes to Wikipedia articles." *About Wikipedia*, Wikipedia,  (May 13, 2014, 5:54 PM), http://en.wikipedia.org/wiki/Wikipedia:About.  See, e.g., *United States v. Lawson*, 677 F.3d 629, 650–51 (4th Cir. 2012); *Bing Shun Li v. Holder*, 400 F. App'x 854, 857–58 (5th Cir. 2010); *Badasa v. Mukasey*, 540 F.3d 909, 910–11 (8th Cir. 2008); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 976  n.19 (C.D. Cal. 2010); *Kole v. Astrue*, No. CV 08-0411, 2010 WL 1338092, at *7 n.3 (D. Idaho Mar. 31, 2010) ("Wikipedia is not a reliable source at this level of discourse."); *Baldanzi v. WFC Holdings Corp.*, No. 07-CV-9551, 2010 WL 125999, at *3 n.1 (S.D.N.Y. Jan. 13, 2010); *Campbell ex rel. Campbell v. Secretary of Health and Human Servs.*, 69 Fed. Cl. 775, 781 (Fed. Cl. 2006).  This skepticism is unsurprising given that Wikipedia articles may be written and

Section 1983 allows individuals who have been injured by officials acting under color of state law to seek redress for their injuries for deprivations of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *Id.* However, "while treaties may comprise international commitments[,] they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quotation marks omitted).  In contrast, "[c]ustomary international law results from a general and consistent practice of states followed by them from a sense of legal obligations."  *Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir. 2001) (citing Restatement (Third) of Foreign Relations Law § 102 (1987)). "Some customary norms of international law reach a 'higher status,' in which they 'are recognized by the international community of states as peremptory [norms], permitting no derogation.'  These peremptory norms are also referred to as *jus cogens*."  *Id.* at 372–73.

Turning first to the ICCPR, the Supreme Court rejected the argument that the United States's ratification of the ICCPR creates individual rights:  "although the [ICCPR] does bind the United States as a matter of international law, the United States

---

edited anonymously, are composed "largely by amateurs," and are "not subject to any peer review."  *About Wikipedia.*  Although Wikipedia articles may be entertaining, or even thought-provoking, and might point an interested person in a certain direction for further reading, the court does not advise including it as a source in further filings in court—this one or any others.  "Say what you might about citing as authority a source that once, for a brief time, credited the U'wa people of Venezuela and Colombia with the invention of puff pastry, but there are definite advantages to being able to cite an authority that you can always rewrite to suit your current needs."  Élise Hendrick, *Wikipedia The New Consensual Reality*, 11 Green Bag 2d 187, 188 (2008).

ratified the [ICCPR] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004); *see also Buell*, 274 F.3d at 372. Plaintiffs' claim under the American Declaration also fails as the United States has not ratified the American Declaration, which means that it is not domestic law and therefore provides individuals with no independent rights in federal court. *Garza v. Lappin*, 253 F.3d 918, 923 (7th Cir. 2001) ("the American Declaration on the Rights and Duties of Man . . . is merely an aspirational document that, in itself, creates no directly enforceable rights."). Similarly, because the United States has not ratified the CRC, it also creates no independently enforceable rights for Plaintiffs. *See Roper v. Simmons*, 543 U.S. 551, 576 (2005); *Taveras v. Taveraz*, 477 F.3d 767, 780 (6th Cir. 2007); *Olivia v. United States Dept. of Justice*, 433 F.3d 229, 232–33 (2d Cir. 2005). For these reasons, Plaintiffs' claim for violations of the above-mentioned treaties fails.

Plaintiffs also argue that, irrespective of their rights under international treaties, the separation of youth from adults in correctional institutions is an established peremptory norm of international law, therefore constituting binding law in the United States. A similar argument was considered and flatly rejected some years ago by another judge of this district:

> Plaintiffs note that customary international law is recognized as forming part of federal common law. *See generally Sosa v. Alvarez-Machain*, 541 U.S. 692, 729 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."). However, it is a logical leap to suggest that a violation of customary international law gives rise to a private cause of action and remedy. Although Plaintiffs argue that a private cause of action should be inferred, they do not cite a case in which a court has actually done so. *See Buell v. Mitchell*, 274 F.3d 337, 374 (6th Cir. 2001) ("Courts that have determined that private rights of actions exist under

16

customary norms of international law have done so where acts were committed on a foreign citizen or acts were committed by a foreign government or governmental official . . . '[w]hile some language in several decisions of courts of appeal states that U.S. courts have recognized the concept of *jus cogens* as part of U.S. law, not a single case has been decided on that basis alone without having been overturned.'") (citations omitted).  This court is not inclined to create a cause of action based upon customary international law where the legal authority in support of such a claim is virtually nonexistent and Plaintiffs' avenue of redress, if any, is derived from the United States Constitution.

*Hill v. Snyder*, No. 10-14568, 2011 WL 2788205, at *6 (E.D. Mich. July 15, 2011)

(O'Meara, J.).  Further, "the determination of what international obligations the United

States chooses to recognize or enforce is an area that has been recognized as

entrusted principally to the Legislative and Executive branches of the federal

government."  *Buell*, 274 F.3d at 337.  Although the court recognizes its power to

"recognize new private causes of action for certain torts in violation of the law of

nations," the Supreme Court urged caution in this regard, warning: "We have no

congressional mandate to seek out and define new and debatable violations of the law

of nations, and modern indications of congressional understanding of the judicial role in

the field have not affirmatively encouraged greater judicial creativity."  *Sosa*, 542 U.S. at

724, 728.  This admonishment against "judicial creativity" is particularly relevant in a

context where, as here, Congress has either not ratified the international authority on

which Plaintiffs rely, or, where it has done so (as in the case of the ICCPR), it has

expressly stated that its ratification does not create individually enforceable obligations.

*Sosa*, 542 U.S. at 735.  Section 1983 is not a vehicle with which to inject Plaintiffs'

customary international law claims into federal law.  Plaintiffs' international law claim is

baseless.  Accordingly, the court grants Defendants' motion to dismiss.

17

## C.  Plaintiffs' Motion for a Protective Order and
### Defendants' Motion for a More Definite Statement

Plaintiffs move for a protective order allowing them to proceed pseudonymously, and Defendants move for a more definite statement from Plaintiffs, specifying: "(i) a description of the alleged sexual assaults; (ii) the dates on which the sexual assaults occurred; (iii) the names of each and every individual who participated and who aided and abetted in the sexual assaults; (iv) the location where the sexual assaults occurred; and (v) the nexus between the sexual assaults and the alleged violation by specifically identified Defendants of Plaintiffs' constitutional rights."  (Dkt. # 59, Pg. ID 801.)

Addressing first Plaintiffs' request that they be allowed to proceed pseudonymously, the federal rules require that the title of a complaint must generally name all of the parties to an action.  Fed. R. Civ. P. 10(a).  However, the court may excuse Plaintiffs from identifying themselves if it determines that Plaintiffs' privacy interests substantially outweigh the presumption of open judicial proceedings.  The Sixth Circuit identified four factors for the court to consider:

> (1) whether the plaintiffs seeking anonymity are suing to challenge governmental activity; (2) whether prosecution of the suit will compel the plaintiffs to disclose information of the utmost intimacy; (3) whether the litigation compels plaintiffs to disclose an intention to violate the law, thereby risking criminal prosecution; and (4) whether the plaintiffs are children.

*Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004).  Plaintiffs argue that they meet all four factors.  First, they are undoubtedly challenging governmental activity in that they claim Michigan improperly housed juvenile prisoners with adults.  They also allege that certain MDOC correctional officers participated in sexual and physical abuse and allowed sex trafficking to occur.  Second, they allege sexual harassment and abuse, which is clearly

18

a matter of "the utmost intimacy."  *See Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997).  Although the complaint does not allege an intent to violate the law, Plaintiffs reasonably argue that discovery in this matter may reveal "extraordinary means they have taken to protect themselves, some of which may be violation of [] MDOC policy" which could expose them to punishment from prison authorities.  (Dkt. # 63, Pg. ID 962.)  Lastly, Plaintiffs allege that Defendants' illegal conduct occurred while they were still children, thus satisfying the fourth factor.

Although Defendants oppose Plaintiffs' request to proceed pseudonymously, they do not present any reason why Plaintiffs' request should not be granted, aside from asserting that Plaintiffs' actual identities should be disclosed to Defendants' counsel in order to allow counsel to respond to the claims, a point that Plaintiffs do not oppose. With the above in mind, it is baffling why the parties could not agree on a protective order for Plaintiffs' identities.  The court therefore grants Plaintiffs' motion for a protective order allowing them to proceed pseudonymously, with greater specificity provided below.

Defendants move for a more definite statement from Plaintiffs, arguing that they are unable to prepare a proper response to Plaintiffs' claims as the complaint does not reveal the identities of Plaintiffs, the adult prisoners who assaulted Plaintiffs, the MDOC personnel who allegedly aided and abetted sexual assaults, or the date, time, and location of the alleged assaults.

The federal rules allow parties to move for a more definite statement of a pleading to which a responsive pleading is allowed:

A party may move for a more definite statement of a pleading to which a

19

> responsive pleading is allowed but which is so vague or ambiguous that he
> party cannot reasonably prepare a response.  The motion must be made
> *before filing a responsive pleading* and must point out the defects complained
> of and the details desired.

Fed. R. Civ. P. 12(e) (emphasis added).  On December 20, 2013, Defendants first

moved for a more definite statement.  On December 31, 2013, the court struck

Defendants' motion[4] for failing to comply with E.D. Mich. Local R. 7.1(a), which requires

parties to confer and seek concurrence in their requested relief *prior* to filing any motion

before the court, and, failing the ability of the parties to agree, that the moving party

include a statement explaining that there was a conference between the attorneys and

that concurrence was denied.  Defendants' motion for a more definite statement

contained no such statement.  In its order, the court directed the parties to confer with

each other and file a joint statement explaining their efforts to resolve the issues in the

terminated motions by January 17, 2014.  (Dkt. # 34, Pg. ID 247–48.)  Defendants filed

their answer to Plaintiffs' complaint on January 3, 2014, without seeking an extension of

the time to respond, and without renewing their motion for a more definite statement in

compliance with Local Rule 7.1(a).   On March 28, 2014, Defendants renewed their

motion for a more definite statement.

The plain language of Rule 12(e) requires a motion for a more definite statement

to be made before filing a responsive pleading.  A motion for a more definite statement

"is designed to strike at unintelligibility rather than want of detail and . . . allegations that

are unclear due to a lack of specificity are more appropriately clarified by discovery

rather than by an order for a more definite statement."  *In re European Rail Pass*

---

[4] The court also struck a motion by Plaintiffs for the same reason.

*Antitrust Litig.*, 166 F. Supp. 2d 836, 844 (S.D.N.Y. 2001) (citation omitted).  Such a motion "should not be granted unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it."  *Id.* (citation omitted).

In the instant case, Plaintiffs' complaint provided sufficient detail to allow Defendants to answer it.  And, there is nothing conjectural about this observation: Defendants did, in fact, answer the complaint.  The court did not terminate Defendants' original motion on the merits; rather, it directed Defendants to comply with Local Rule 7.1(a) before filing any motion with the court and to confer with opposing counsel as required by this rule.  Now that Plaintiffs' complaint has been answered, Defendants will be free to seek answers to their questions through the normal discovery process, subject to a protective order that the court will issue at a later date.  Accordingly, Defendants' motion for a more definite statement is denied as moot.

## VI.  CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment and Motion to Dismiss [Dkt. # 47] is GRANTED in part and DENIED in part.  Defendants are denied summary judgment on Plaintiffs' claim for prospective injunctive relief.  However, Count V of Plaintiffs' complaint is DISMISSED WITH PREJUDICE.[5]

IT IS FURTHER ORDERED that Defendants' Motion for More Definite Statement is DENIED as moot.

---

[5] *See Wikipedia*, (May 27, 2014, 5:54 PM),
http://en.wikipedia.org/wiki/Prejudice_(legal_procedure)

IT IS FURTHER ORDERED that Plaintiffs' "Renewed Motion for a Protective Order to Proceed Anonymously" [Dkt. # 63] is GRANTED.  A Plaintiff will be allowed to proceed pseudonymously provided that he disclose his actual identity to the court under seal not later than **June 3, 2014**.  Defendants shall be provided a copy of each such disclosure.  Neither party is permitted to disclose a Plaintiff's identity to anyone, including Defendants' clients and Plaintiffs' other clients, without or until further order of the court.

       s/Robert H. Cleland                         
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 28, 2014


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 28, 2014, by electronic and/or ordinary mail.

       s/Lisa Wagner                            
Case Manager and Deputy Clerk
(313) 234-5522