UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE 1; JOHN DOE 2, JOHN DOE
3, JOHN DOE 5; JOHN DOE 6; and next
friends of minors JOHN DOE 4 and JOHN
DOE 7, on behalf of themselves and a class
of others similarly situated,

      Plaintiffs,

v

MICHIGAN DEPARTMENT OF
CORRECTIONS (MDOC), RICK
SNYDER, DANIEL H. HEYNS, THOMAS
FINCO, DENNIS STRAUB, RANDY
TREACHER, WILLIE SMITH, HEIDI
WASHINGTON, MARY BERGHUIS,
PAUL KLEE, JOHN PRELESNIK,
CATHLEEN STODDARD, CINDI S.
CURTIN, DAVID BERGH, JEFFREY
WOODS, ROBERT NAPEL, and
KENNETH MCKEE,

      Defendants.

NO. 2:13-cv-14356

Hon. ROBERT H. CLELAND

Mag. R. STEVEN WHALEN

_____

## EVIDENTIARY HEARING BRIEF IN SUPPORT OF PLAINTIFFS'MOTION FOR *GULF OIL* PROTECTIVE ORDER

# Table of Contents

Table of Contents…………………………………………………………………pg. 2

I.      Statement of Facts……………………………………………………pg. 3

II.     Legal Standards………………………………………………………pg. 5

III.    **The circumstances of Defense Counsel's interviews and the status of the youth resulted in a coercive atmosphere and inherently incredible statements**……...pg. 8

        A.   <u>Interviews with youthful prisoners require protections consistent with their child status, and the circumstances of Defense Counsel's interviews and the status of the youth resulted in a coercive atmosphere and inherently incredible statements</u>……………………………………………………..pg. 8

        B.   <u>Defendants and Defense Counsel's conduct in unilaterally interviewing youthful inmates in the prison context constitutes an abusive form of communication that threatens the proper functioning of the litigation</u>…………………………pg. 11

Expert Testimony in Support of Motion…………………………………………...pg. 17

Remedies…………………………………………………………………………...pg. 21

Conclusion…………………………………………………………………………pg. 25

## I.     <u>Statement of Facts</u>

Michigan law allows for the imprisonment of minors in adult prisons. Adolescents from 13 to 17 years old are incarcerated alongside adult convicts of all ages. With between 100 and 200 youthful prisoners held in adult penitentiaries at any given time, Michigan has one of the highest youth prison populations in the country. Youth housed in adult prisons are eight times more likely to be sexually assaulted than other inmates and six times more likely to be sexually assaulted in adult prisons, as compared to juvenile facilities (Complaint at p. 9).

Plaintiffs have filed a class action lawsuit under Fed. R. Civ. P. Rule 23 on behalf of all youth in Michigan prisons who have been subjected to rape, sexual abuse and harassment, excessive solitary confinement, and physical assaults. Plaintiffs bring their claim under 42 U.S.C. 1983, alleging a series of Constitutional violations (Complaint at p. 23-27).

During the pre-certification stage of this action, plaintiffs became aware of some troubling litigation tactics initiated by defense counsel. Assistant Attorneys General (AAGs), in concert with local prison personnel, sought out every youthful prisoner held in a Michigan prison, and every inmate who was a minor at some point during their incarceration, interviewed them, and pressed them to sign an affidavit admitting or denying that they had experienced sexual assault. The youth were directed to leave their cells and speak with an AAG from the State of Michigan, whose client has adverse interests to the plaintiff class in *Doe, et al v. MDOC*. Agents of the MDOC led the prisoners into closed-door rooms for interviews (Pl. Motion for Protective Order at p. 6).

It is undisputed that all of these interviews took place at the pre-certification stage of the litigation process, and class counsel has no reason to believe that, at the time of the interviews,

any of the affiants were aware of the pending class action suit under which they may have had legal rights.

The affidavits of AAGs Farrell, Thurber, Barkman, and Schneider filed with the court as part of the Defendants response to Plaintiffs motion for Protective Order (Docket #68) serve as the factual basis for the assertions contained herein regarding the AAGs conduct in securing the affidavits in question.

During these interviews, without notice of the AAGs' adverse interests, and without notification of their potential legal rights in the current action, the youth were questioned regarding their personal experience with sexual assault in prison. Without notification of their legal rights, assurances of confidentiality, or that their testimony would not lead to retaliation, the incarcerated minors were then directed to sign fill-in-the-blank affidavits, written in legalistic language, which would either confirm or deny whether they had been sexually victimized during their term of imprisonment.  Defense counsel has confirmed that the affidavits were part of their litigation strategy, and it is clear that the defense seeks to use the affidavits to eliminate members from the future class or discredit class members at trial.

Class counsel will establish that these interviews were an abusive communication pursuant to the U.S. Supreme Court ruling in *Gulf Oil v. Bernard*. Testimony will be elicited from six incarcerated minors and three experts from relevant fields of legal ethics, psychology, prison culture, and MDOC policies. The evidence will show that the AAGs failed to notify putative class members about the existence of a specific class action lawsuit potentially involving the rights of the prisoners being interviewed. Further, it will be clear from the evidence that the AAGs did not inform the putative class members that the AAGs interests were adverse to

4

the prisoner's interests, and that, as a consequence, statements made by the prisoners could be used as evidence against them. Additionally, testimony will establish that putative class members were confused and/or misled about the nature of the interviews because the prisoners did not know that he was being interviewed about a case in which he had a personal interest. It is undisputed that the AAGs failed to advise the putative class members that the content of the affidavits could be used at a later date to destroy or diminish their legal rights. The testimony as a whole will illustrate the abusive and unethical nature of the communications between agents of the defense and putative class members, in addition to the inherently coercive prison environment under which such communications were made.

## II.   <u>Legal Standards</u>

The issuance of protective orders is clearly within the power of district courts under the Federal Rules of Civil Procedure. For example, Rule 26(c)(1) provides that, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Furthermore, Rule 26(c)(1)(B) and Rule 26(c)(1)(E) provide examples of stipulations which courts may make, including "specifying terms, including time and place, for the disclosure or discovery," and "designating the persons who may be present while the discovery is conducted." Fed. R. Civ. P. 26(c)(1).

Furthermore, FRCP Rule 23(d)(1) states that, "In conducting an action under this rule, the court may issue orders," and Sections A-E suggest the types of orders that courts may issue. Fed. R. Civ. P. 23(d)(1). Section E states that, "the court may issue orders that (E) deal with similar

5

procedural matters,"[1] and *Moore's Federal Rules Pamphlet, 2014* specifically cites court orders to limit communications during pre-certification phase of class action litigation (*Gulf Oil* cases) as an appropriate subject for an order under FRCP Rule 23(d)(1)(E). 1 Moore's Federal Rules Pamphlet § 23.7, 318 (Matthew Bender, 2014). Thus, the Federal Rules of Civil Procedure provide for, and grant specific authority to courts to issue orders ensuring appropriate communications between parties, counsel, and putative class members under FRCP Rule 23.

In *Gulf Oil v. Bernard*, the guiding Supreme Court case on appropriate communications between counsel and putative class members, the Court explained the broad right of courts to issue protective orders in federal class actions under Rule 23. *Gulf Oil v. Bernard*, 432 U.S. 89 (1981). "Because of the potential for abuse [of the class action process], a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Id*. at 100. Since the actions of each class member necessarily affects the legal rights of every other class member and since counsel on either side may not have complete information regarding the identity of class members, unethical tacticians can substantially alter the rights of the parties. Furthermore, attorneys are often in a position to abuse class members by using their knowledge of the action against the ignorance of putative class members, sometimes effectively destroying their legal rights. "Direct communications with class members . . . can lead to abuse. For example, defendants might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed." Manual for Complex Litigation, Fourth § 21.12 at 248. Due to the unique susceptibility of class action proceedings to abuse by attorneys and defendants, courts do have broad authority to issue protective orders governing the conduct of interested parties.

---

[1] Fed. R. Civ. P. 23(d)(1)(E).

The Court in *Gulf Oil* also set forth the rule for determining when a protective order limiting communications should be granted. "An order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co v. Bernard* at 102. Specifically, the Court recognized the appropriate balance as the need to halt abuses of Class Action procedures by parties with adverse interests against the First Amendment right of counsel to communicate with class members. "Such a weighing— identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102.

Since *Gulf Oil*, courts have held that the party filing a motion to obtain a protective order has the burden of proving the following standards. First, the movant must show that "a particular form of communication has occurred or is threatened to occur." *Zwerin v. 533 Short North, LLC*, 2011 U.S. Dist. LEXIS 65880, 7 (S.D. Ohio June 15, 2011), quoting *Ojieda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1378 (S.D. Ga. 2009). Second, the movant must show that "the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation." *Id*.

In addition to the legal standards of proof, ethical standards for attorneys also play a central role in a court's ruling on a motion for a Protective Order in Class Actions. The American Bar Association Model Rules of Professional Conduct provides for the following:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands

7

the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

Rule 4.3 Dealing with Unrepresented Person, Ann. Mod. Rules Prof. Cond. s. 4.3

Including consideration for the ethical conduct of attorneys through the process is a critical component of a sound *Gulf Oil* analysis for granting a protective order. See Debra Lyn Bassett, "Pre-Certification Communication Ethics in Class Actions, 36 Ga. L. Rev. 353, 367 (Winter, 2002).

## III.   The circumstances of Defense Counsel's interviews and the status of the youth resulted in a coercive atmosphere and inherently incredible statements.

A.   Interviews with youthful prisoners require protections consistent with their child status, and the circumstances of Defense Counsel's interviews and their status of the youth resulted in a coercive atmosphere and inherently incredible statements.

Youth housed in adult prisons are at their most vulnerable and disproportionately victims of physical abuse, sexual violence, and humiliation. The U.S. Department of Justice has recognized the increased risk of sexual violence placed upon children in adult facilities. 42 U.S.C. § 15601(4). In adult prison, children are more than eight times as likely to have a substantiated incident of sexual violence, based on reported incidents. The true prevalence of these rapes is undoubtedly higher – both due to under-reporting, lack of safe non-futile avenues for reporting and absence of adequate investigations to sustain allegations. National Standards to Prevent Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106-01, 37128 (Jun.20, 2012). (amending 28 C.F.R. pt 115) ("[F]rom 2005 through 2008, 1.5 percent of victims of substantiated

incidents of inmate-on-inmate sexual violence in State prison were under 18, even though under-18 inmates constituted less than 0.2 percent of the State prison population.").

The U.S. Supreme Court has recognized that "children cannot be viewed simply as miniature adults." *J.B.D. v. North Carolina*, __ U.S.__; 131 S Ct 2394, 2404 (2011) (internal citations and quotations omitted) (holding that a child's age properly informs a due process custody analysis).  In addressing the disadvantages for children negotiating their rights in custodial interviews, the Court noted that, "[a] child's age is far more than a chronological fact. It is a fact that generates common sense conclusions about behavior and perception…children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." *Id*. at 2403. This is particularly true for youth in adult prisons  as a result of the inherently coercive environment, experiencing shame and fear resulting from the abuse they have endured. *See* testimony from Stapleton, Kupers.

Contrary to Defendant's assertions, the interviews conducted by the AAGs were not standard visits as they took place on statewide non-visiting days, were sometimes conducted cellside, and youthful prisoners were not told they could refuse to participate or leave freely. The nature of the prison environment, the identity of the interviewers and the method by which each prisoner was brought out clearly evince that the meetings were not voluntary. *See* testimony from Stapleton.

The current case is clearly distinguishable from a case Defendants assert they will rely upon, *Howes v. Fields*, __ U.S. __; 132 S. Ct. 1181 (2012). In addition to *Howes* involving a question of Miranda rights in a custodial setting, the case involved an adult, not minors, being questioned by sheriff's deputies about a criminal matter that occurred outside of the prison

9

environment.  Unlike in *Howes*, the issues addressed in the interview did not involve events that occurred in the outside world that would not impact the conditions of their confinement. Moreover, the adverse nature of Defendant's counsel was not readily apparent to the youthful prisoners, nor did they take precautions to inform them of their adverse interest.  The fact that the prisoners were minors, had no knowledge of their rights, taken to a closed room and interrogated about a highly charged issue of sexual abuse makes the present case akin to the custodial interrogation which took place in *J.D.B*. Youthful prisoner interviewed were not told they could leave or terminate the interview, nor were they provided food or water.

Questions posed to youthful prisoners concerning sexual abuse by staff and adult prisoners are highly charged and intimidating.  Both federal and state statutes recognize the vulnerability of child victims of abuse, and afford greater protections than adults in judicial proceedings for their physical and psychological well-being. *See, e.g.,* Child Victims' and Child Witnesses' Rights Act, 18 U.S.C.A. § 3509 (sets forth procedures for deposing, questioning, and examining child victims of physical and sexual abuse or exploitation in judicial proceedings); *and see* Mich. Comp. Laws. Ann. § 712A.17b (provides protections for alleged victims who are either children or developmentally disabled).  In many instances, courts will not grant leave to depose an incarcerated youth where the deposition would be burdensome or harmful to the youth. For example, in *Williams ex rel. Williams v. Greenlee*, the court denied the defendants' (officer, county, and the detention center) motion for leave to take the oral deposition an incarcerated youth who had been sexually assaulted by an officer at the juvenile detention facility he was housed in. The court reasoned that forcing the youth to be deposed in the same environment as the alleged assault would be burdensome and oppressive. *Id*. According to the court, "[i]t cannot be doubted that forcing a juvenile to recount the details of an alleged sexual

10

assault can be traumatic and embarrassing even under the best of circumstances. Questioning a 16–year old juvenile about such facts in the same environment where the incident occurred can only exacerbate the potential harm to the deponent." *Id.* at 579.

Both the deeply personal nature of these questions and the danger of reporting, as well as the perfunctory nature of the interview process makes the responses contained in Defense Counsel's affidavits incredible. Those youth who had assaulted were likely threatened by the perpetrators and deeply ashamed of reporting the assaults to the AAGs, who were not clear in what their purpose was, would have been highly unlikely. *See* testimony from Kupers.

      B.     <u>Defendants and Defense Counsel's conduct in unilaterally interviewing youthful inmates in the prison context constitutes an abusive form of communication that threatens the proper functioning of the litigation.</u>

Courts may grant protective orders to prevent abusive practices from hindering the rights of the putative class members and the proper functioning of the litigation. "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Lewis v. Huntington Nat'l Bank*, 2011 U.S. Dist. LEXIS 156175, 13-14 (S.D. Ohio Oct. 24, 2011), *citing Cox Nuclear Med. v. Gold Cup Coffee Servs.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003).

While defendant's counsel can communicate with the putative class, all information communicated must be accurate and impartial. For example, in *Kleiner v. First National Bank*, the court acknowledged that "[w]hen confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential

11

liability by soliciting exclusion requests." *Kleiner v. First National Bank*, 751 F.2d 1193, 1202 (11th Cir. Ga. 1985).

Ultimately, the court in *Kleiner* found that misstatements during "unsupervised, unilateral communications" could cause "irreparable" damage. *Id.* In *Kleiner*, the class was comprised bank customers who claimed to be overcharged by a bank's secret decision to switch interest rates on loans. The district court granted a motion for a Protective Order by the plaintiffs limiting defendant contacts with the class to no more than five depositions. This order was granted on the justification that, "unilateral contacts by the Bank before the close of the exclusion period would intimidate eligible members, many of whom would be very worried about their credit ratings and their ability to borrow in the future." Id. at 1196.

Here, youth prisoners were pressured to sign affidavits presented unilaterally by defense counsel and agents of the defendants. The affiants here had a number of worries more worthy of trepidation than mere concerns over future credit—as no assurances against retaliation were given to young prisoners regarding any admission to being a victim of sexual assault. Any misstatements provided during these unilateral contacts with putative class members could serve to cause irreparable damage to the class and the litigation, since the affidavits could be used to destroy the youth prisoner's legal rights in the action.

Furthermore, youthful prisoners in the present case, unlike the plaintiffs in *Kleiner*, were never made aware of any legal rights they might have relating to the Affidavits. In *Kleiner*, the Bank solicited opt-out forms, which required that the class members at the very least were aware that they had some legal right to opt-out of the class action. The putative class members here were never given notice of the lawsuit, were never made aware of the adverse interests of the

12

AAGs, and were asked to sign the affidavit without being informed of their right to seek counsel or advised to do so before signing documents which could destroy or diminish their legal rights.

The court in *Kleiner* further stated that, "[i]t is unnecessary for a trial court to issue particularized findings of abusive conduct when a given form of speech is inherently conducive to overreaching and duress." *Kleiner* at 1206; *see also Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999) (ruling that an employer in a class action employee discrimination suit has an undeniable financial interest in the case that is inherently conducive to coercive communications). Coercive circumstances are inherent in cases where one party has authority over the other. One common example of this is the employer/employee context.[2]

When compared to the factual scenario in the present case, with incarcerated teens being questioned by State authorities in the prison where they are incarcerated, there is little doubt that the communications by the AAGs were at least as, if not more, inherently conducive to coercion. Even though particularized findings of abusive conduct are present in the present case, such findings are not required to grant a motion for a protective order during the pre-certification stage of this case because the communications were inherently conducive to coercion.

Although the inherently coercive special relationships, such as employer/employee relationships, may not be sufficient on their own to constitute abusive communications in all judicial circuits, such relationships have been found a highly persuasive factor, particularly when

_____

[2] See also *Bower v. Bunker Hill Co.*, 689 F. Supp. 1032, 1034 (E.D. Wash. 1985) ("[T]he imbalance in knowledge and skill which exists between class members and defense counsel presents an extreme potential for prejudice to class members' rights.").

other types of abusive communication are present. For example, in *Longcrier v. HL-A Co., Inc.*, the defendant employer called each of its workers into a one-on-one meeting during work hours with its attorney. In that case, the communication was abusive not only because of the coercive setting but because the communication was entirely misleading and "were obviously designed to lull prospective plaintiffs into a false sense of security and to effectuate their complete cooperation with minimal resistance." *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1229 (S.D. Ala. 2008).

In the present case, defense counsel communications with putative class members were confusing and misleading, and qualify as *abusive communications* under *Gulf Oil*. In *Oetinger v. First Residential Mortg. Network, Inc.*, a co-defendant to a class action made contacts with class members advising against their decision to opt-in because it would require them to expose their private communications. The court noted that "[i]t is difficult to imagine any advice from [defendant company's owner] regarding the lawsuit that is not rife with the potential for confusion and abuse given defendants' interest in this lawsuit, regardless of whether it was intended to mislead." *Oetinger v. First Residential Mortg. Network, Inc.*, 2008 U.S. Dist. LEXIS 41281, 6-7 (W.D. Ky. May 23, 2008). The court explained further that "[s]uch communication may interfere with the administration of the collective action by encouraging parties not to continue to participate." *Id*.

Here, prisoners expressed confusion over a variety of issues due to the ambiguous nature of the AAGs relationship to the inmates and unclear purpose of the interview. The AAGs never made clear that they had adverse interests, as opposing counsel in a lawsuit to which the inmates may have legal rights. Furthermore, defense counsel failed to notify youth prisoner's that there was a pending class action. They failed to notify youthful prisoners that they had potential legal

14

rights in that class action. And they failed to notify youthful prisoners that the affidavits they signed could be used to destroy or diminish those legal rights. Instead, in most situations, the AAGs said vaguely that the MDOC was involved in "a lawsuit" regarding sexual assault in Michigan prisons. The AAGs then proceeded to question the youthful prisoners on the issue of sexual assault without providing meaningful context to how their testimony would affect their legal rights. These unethical tactics did, whether intentionally or not, cause enormous confusion and constituted abusive communications in accordance with *Gulf Oil*.

In addition, failure to recommend or notify putative class members of their right to seek independent counsel can be persuasive evidence of coercion. For example, in the Sixth Circuit case, *O'Neil v. Appel*, the court held that "[t]he fact that the Letter recommends that the putative class members seek the advice of independent counsel is evidence that [defendants] are not attempting to coerce the putative class members to opt out of this litigation simply for the simple purpose of frustrating the instant action." *O'Neil v. Appel*, 1995 U.S. Dist. LEXIS 4417, 5 (W.D. Mich. Mar. 21, 1995). In the present case, defense counsel failed to advise putative class members of their right to seek counsel before or during the interview, and they did not advise putative class members to seek independent counsel regarding how the interview and the accompanying affidavits might affect their legal rights.

Moreover, failure to notify putative class members about pending litigation can itself be misleading. In *Friedman v. Intervet Inc.*, for example, the defendant obtained settlements and releases from putative class members without informing them of the ongoing litigation. The judge in that case found that "defendant has procured settlements and releases without informing putative class members of what they are possibly giving up: participation in the pending putative

class action. I find defendant's failure to provide such notice to putative class members before securing settlements or releases misleading, and supported by a 'clear record' of such failure." *Friedman v. Intervet Inc*., 730 F. Supp. 2d 758, 763(N.D. Ohio 2010).[3]

Finally, the decision in *Mevorah v. Wells Fargo Home Mortg*., shows that soliciting affidavits on behalf of defendants in a class action in order to exclude members from a class can also constitute abusive communication. In *Mevorah*, the class action was filed by employees seeking unpaid overtime. The employer allegedly contacted prospective class members and provided false information regarding their future pay if they become class members. While the court found that the employers statements were misleading, its ruling went even further because it involved "the solicitation of signed declarations, thus committing employees who are potential class members to a set of facts that may be adverse to their interest and without their having been fully informed of all aspects of the case. The opportunity for mischief is compounded by the relationship between the employer and the employee and the coerciveness an employee may feel." *Id. Mevorah v. Wells Fargo Home Mortg*., Inc., 2005 U.S. Dist. LEXIS 28615, 2005 WL 4813532, 16 (N.D. Cal. Nov. 17, 2005).

The AAGs in the present case solicited signed declarations from affiants where were not fully informed of the aspects of the case, and not even made aware that the Assistant Attorney Generals had interests potentially adverse to their own when signing these declarations of fact.

---

[3] See also *Filby v. Windsor Mold USA, Inc*., 2014 U.S. Dist. LEXIS 7667, 6-7 (N.D. Ohio Jan. 22, 2014) ("[S]ome of Defendant's communications were misleading and therefore require a certain level of control. Specifically, certain of the communications were misleading because they could potentially have caused recipients to conflate the DOL settlement with the instant lawsuit.").

This finding on the record shows a clear abuse warranting limitations on future communications between putative class members and the agents of the defense regarding this case.


**IV.    Expert Testimony in Support of Argument**

Plaintiffs will offer the testimony of three experts who will speak to issues directly related to the present *Gulf Oil* analysis. Below is a brief summary of each expert's testimony.

Testimony of Professor Linda Mullenix

Linda Mullenix is a professor of law at the University of Texas School of Law.  She has been a professor at UT since 1991.  She began her career as a law professor in 1982.  Her area of expertise is Class Action Litigation, Aggregate Litigation, Civil Procedure and Mass Tort Litigation. She is the author or co-author of 19 books and treatises in her area of expertise. She has authored more than 100 published articles on the topics of class actions, aggregate litigation and civil procedure.  She has served as a class action litigator, consultant and court approved expert witness in numerous class action matters.

Professor Mullenix has reviewed the affidavits of the Assistant Attorney Generals ("AGs") who conducted the unilateral pre-certification putative class members/ prisoner interviews in November and December of 2013.  She has also reviewed the available prisoner affidavits secured by the AG and the counter affidavits secured by class counsel.  She has read the transcripts of various state and federal court hearing where the AGs have described the manner in which the affidavits were secured and the AGs statement of purpose in securing the affidavits.

17

Professor Mullenix will testify that a *Gulf Oil* protective order restraining the conduct of defense counsel is warranted because the AGs universally failed in their ethical duty to inform the affiants that the AGs interest were adverse to the interests of the putative class members.  At a minimum, the AGs were duty bound to inform the prisoners that signing an affidavit, which indicates that he did not experience any sexual assaults or harassment, could result in their exclusion from the class action or eliminate or impair their claim for compensation. It was breach of the AGs ethical duty not to clearly inform each affiant of the potential consequences which may result from their signing an affidavit which disclaims injury or exposure to wrongful conduct. She will testify that AGs statement that that the affidavits were secured in order to "impeach" a class member if he changes his testimony is proof that the AGs were improperly motivated when they unilaterally secured affidavits from these prisoners.

It is undisputed that when the prisoners were interviewed by the AGs, they did not know that the class action had been filed on their behalf. Professor Mullenix is expected to say that the AGs misled the affiants when they advised the affiants that the interviews were being conducted because of the filing of a generic lawsuit alleging sexual assaults on youthful prisoners.  This was misleading because the AGs failed to inform the prisoners that they were the subject matter of the lawsuit and that they may directly benefit from that lawsuit.  The AGs in their own affidavits universally alluded to the "lawsuit" as an activity that did not directly involve the putative class member. It was grossly misleading to allude to an abstract "lawsuit" and conceal from the prisoners that the lawsuit in reality involved them.

Finally, professor Mullenix will testify that because the putative class members were asked to execute affidavits against their interests in an inherently coercive environment and

18

because of the AGs abusive and misleading conduct which has already taken place, the protective order should prohibit the AGs from any further unilateral contact with the incarcerated putative class members.  She will also testify that the court should order that the affidavits of the prisoners already secured are presumed to be invalid and will remain so  until validated by the affiant in a deposition where class counsel are in attendance.

Richard Stapleton, J.D.

Richard Stapleton, JD serves as a consultant and expert witness on prison issues. Mr. Stapleton retired in 2011 from the Michigan Department of Corrections (MDOC), where he worked for 34 years. During his time at MDOC, Stapleton served as the Administrator for the Office of Legal Affairs; the Administrator for the Office of Policy and Hearings, the Assistant for Rehearings and Rules, as well as an Administrative Law Examiner, a Parole/Probation Officer and a Corrections Officer.  Mr. Stapleton has also served as the Associate Director of Citizens Alliance on Prisons and Public Spending, a non-profit public policy organization that deals with Michigan prison policies.

Stapleton's testimony will include information regarding MDOC policies and procedures – specifically, the level of control that MDOC staff maintain over prisoners, MDOC visiting policies, the ability of prisoners to disobey and the consequences of disobeying an order of MDOC staff, and the manner in which investigations of assault claims are typically handled within MDOC.  Stapleton will also offer opinions regarding the interview process utilized by the Office of the Attorney General to interview prisoners in the context of the MDOC environment. He will provide support for the assertion that that the AAG's' interviews with prisoners were

19

conducted under coercive circumstances and are unlikely to elicit truthful testimony regarding sexual assaults and abuse.

<u>Dr. Terry A. Kupers, M.D., M.S.P.</u>

Terry A. Kupers, M.D., M.S.P. is a Board-certified psychiatrist, Institute Professor at The Wright Institute, a Distinguished Life Fellow of the American Psychiatric Association. He provides expert testimony as well as consultation and staff training regarding the psychological effects of prison conditions such as isolated confinement, the quality of correctional mental health care, and the cultural back-drop and harmful effects of sexual abuse in correctional settings.  Dr. Kupers has published extensively, including the book <u>Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It</u> (1999).  He is co-editor of <u>Prison Masculinities</u> (2002).  He is a Contributing Editor of <u>Correctional Mental Health Report</u>. He received the 2005 Exemplary Psychiatrist award from the National Alliance on Mental Illness (NAMI), and the 2009 William Rossiter Award from the Forensic Mental Health Association of California.

Dr. Kupers will testify about methods for interviewing potential victims of sexual abuse. He will outline the consensus in the mental health fields as well as criminology about an acceptable format for interviews, including careful explanation of the uses of the interview, the issue of confidentiality, the interviewee's rights, and careful consideration of the timing of questions.  This format takes into account the reality of potential sexual trauma and the danger of harm, including re-traumatization from the interview itself.   He will also testify about the culture and social dynamics of prison environments with special reference to the issue of masculinity, as this backdrop has major effects on the interview process.  He will touch on relevant issues in the

20

psychology of adolescents in the criminal justice system. Dr. Kupers will also offer opinions regarding the process utilized by the Michigan Office of the Attorney General to interview prisoners in the current matter, and how the manner in which they conducted the interviews would very likely interfere with the prosecution of the case. The form of communication employed by the Attorney General's Office would have a chilling effect, for example it could easily result in prospective class members excluding themselves from the litigation, and would likely have the effect of undermining confidence in and cooperation with class counsel.

## V.    <u>Remedies</u>

"When the court finds that the class action has been abused to the potential prejudice of class members, the court has full power to take appropriate remedial action to avoid or minimize any prejudice to the class." Herbert B. Newberg & Alba Conte, Newberg on Class Actions §15.2 (4th ed.). Furthermore, the Federal Rules of Civil Procedure grant courts the power to make orders forbidding or limiting certain discovery. See Fed. R. Civ. P. 26(c)(1)(A).

Acknowledging this court's "full power to take appropriate remedial action to avoid or minimize any prejudice to the class," and its power to forbid certain discovery, the proposals below (numbered1-5) are submitted by plaintiffs to the court as remedies to any abuses in prior communications between agents of the defendants and putative class members.

The following terms 1-3 precisely mirror the Protective Order previously entered in the State Case involving the same parties. Despite objections to these orders by defense counsel, terms 1-3 integrated the input provided to class counsel by the AAGs to ensure that they comport with the ruling handed down in *Gulf Oil*, and do represent "A carefully drawn order that limits

21

speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil* at 102.

In addition, Terms 4-5 below are necessary to correct the damage that has been caused to the proper functioning of the litigation and provide protection against the prejudice created against the class by the abusive pre-certification communications that took place when AAGs solicited affidavits from putative class members.

Plaintiffs seek the following forms of relief from this Court:

1.     The named Defendants shall not engage in any discovery or communication regarding the subject matters of this litigation with Plaintiffs or members of the putative class represented by Plaintiffs' counsel.

2.     Defendants and/or their agents, including investigators from internal affairs for the MDOC are prohibited from talking to, or questioning the Plaintiffs in this litigation on subject matters related to the litigation without giving at least 3 days (or less if exigent circumstances exist but enough to give Plaintiffs' counsel the right to be present) prior notice to Plaintiffs' counsel who have the right to be present during the communications with their clients.

3.     Prior to Defendants' counsel having communications with members of the putative class and/or prisoner witnesses, a written notice shall be provided to the putative class member and/or prisoner witness which:

a.     Identifies Defendants' counsel and their adverse position to Plaintiffs and putative class members in this litigation;

b.      Advises the prisoner that she or he is not obligated to meet, speak with or respond to any questions or sign any documents related to this litigation.  That refusal will not subject any prisoner to penalty, punishment, misconduct, retaliation or any adverse action or treatment;

c.      After speaking with a prisoner, advises each prisoner of the name, phone number, J-Pay account and physical address of Plaintiffs' counsel and that states that any prisoner has the right to contact Plaintiffs' counsel after speaking with Defendants. Plaintiffs' counsel may meet with any prisoner (client, prisoner witness, or putative class member) consistent with MDOC visiting policies.

d.      If a prisoner states they do not wish to continue any meeting or communication or advises they are represented by counsel, such interview shall cease immediately.  If the prisoner states that he or she is represented by Plaintiffs' counsel, Plaintiffs' counsel shall be advised by Defense counsel of contact within 24 hours and Defense counsel shall provide Plaintiffs' counsel with any and all documents obtained from Plaintiff during the meeting or communication.

e.      Prisoners shall be removed from their cells and taken directly to interview rooms without delay.  On refusal to participate and/or following an interview, prisoners will be returned to their cells without delay. Standard prison procedures shall not be considered violative of this term.

23

      f.      Written notice pursuant to this order shall be reviewed by Plaintiffs and approved by the Court.

    4.      All affidavits collected by the defendants or defendant's counsel prior to the granting of this Protective Order setting parameters for communication with the Putative Class shall be presumed by this court, or any other court within this jurisdiction with responsibility for the proceedings on this matter, to be invalid. Such a presumption may be overcome where depositions taken from class members or putative class members, in the presence of class counsel, reflect the affiant's true intent toward such prior statements. See Fed. R. Civ. P. 26(c)(1)(A)(giving courts the power to forbid certain discovery).

    5.      Defense counsel must retroactively notify any persons from whom they have collected affidavits relating to the present action, through written letter, to inform the prior affiants of the pending class action. This letter must include information regarding their legal rights in this pending class action, the status of their affidavit based on all orders issued by the court, and the contact information for the plaintiff's attorneys so that they can inquire further about their legal rights in this action.

## Conclusion

Plaintiff's Motion for a Protective Order setting parameters for defense counsel's communications with putative class members in the pre-certification and discovery phase of the litigation should be granted. The granting of this Protective Order will ensure fairness of process in accordance with the purposes of FRCP Rule 23, and guard putative class members against abuses which naturally derive from facts and circumstances unique to their incarceration, minority status, and specific claims as victims of sexual abuse.


DATED:        June 3, 2014

Respectfully submitted,

**/S/MICHAEL L. PITT_____**
MICHAEL L. PITT(P24429)
PEGGY GOLDBERG PITT (P31407)
CARY S. McGEHEE (P42318)
Pitt McGehee Palmer Rivers & Golden PC
117 W 4th St Ste 200
Royal Oak, MI  48067
Phone: (248) 398-9800
mpitt@pittlawpc.com
ppitt@pittlawpc.com
cmcgehee@pittlawpc.com


**/S/DEBORAH LaBELLE_____**
DEBORAH LaBELLE (P31595)
ANLYN ADDIS (P76568)
221 N Main St Ste 300
Ann Arbor, MI  48104
(734) 996-5620
deblabelle@aol.com
aaddis@sbcglobal.net


**/S/JENNIFER B. SALVATORE_____**
JENNIFER B. SALVATORE (P66640)
NAKISHA CHANEY (P65066)
EDWARD MACEY (P72939)
NACHT, ROUMEL, SALVATORE,
BLANCHARD & WALKER, P.C.
Attorneys for Plaintiffs
101 N. Main Street, Ste. 555

Ann Arbor, Michigan 48104
(734) 663-7550
jsalvatore@nachtlaw.com
nchaney@nachtlaw.com
emacey@nachtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing as well as via U.S. Mail to all non-ECF participants.

s/Betsy L. Lewis
Betsy L. Lewis

26