UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE 1, *et al.*,

    Plaintiffs,

v.                                      Case No. 13-14356

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.

                                         /

**OPINION AND ORDER DENYING
PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER**

Plaintiffs seek a protective order governing Defendants' interviews with putative class members and potential prisoner witnesses. (Dkt. # 61.) Specifically, Plaintiffs argue that Defendants engaged in abusive practices by sending Assistant Attorneys General ("AAGs") to interview prisoner witnesses regarding Plaintiffs' allegations of sexual assault by adult prisoners and Michigan Department of Corrections ("MDOC") personnel. In accordance with the Supreme Court's decision in *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1989), the court held an evidentiary hearing on June 4 and 5, 2014, to receive and consider evidence "weighing the need for a limitation [on Defendants' conduct] and the potential interference with the rights of the parties." *Id.* at 101. The court heard closing arguments on the matter on July 23, 2014. For the following reasons, Plaintiffs' motion for a protective order will be denied.

**I. THE EVIDENTIARY HEARING**

Plaintiffs called Richard Stapleton, a retired MDOC official, to testify regarding

MDOC policies and procedures. Stapleton testified that prisons operate "on a basis for stability and consistency" and that prisoners are expected to comply with all staff directions. (Dkt. # 102, Pg. ID 1746.) If a prisoner refuses to obey an order, it can result in a loss of a variety of privileges, confinement to his cell, an increase in his security level, and segregation from the prison population. (*Id.* at 1748–49.) Stapleton also testified that if a prisoner admits to consenting to sexual touching by another prisoner, this could be considered a misconduct and could be subject to discipline. (*Id.* at Pg. ID 1750.) If a prisoner reports sexual misconduct by another prisoner, inspectors at the MDOC facility investigate the allegations. These inspectors are trained to maintain confidentiality and avoid exposing the prisoner to harassment or coercion from other prisoners. (*Id.* at Pg. ID 1756–57.) AAGs do not typically personally investigate allegations of sexual misconduct. (*Id.* at Pg ID 1758–59.)

Regarding the investigation conducted by the AAGs at issue in the present motion, Stapleton stated that in his experience, the AAGs' actions were not conducted consistently with MDOC policy for investigating sexual assaults. (*Id.* at Pg. ID 1761–62.) Stapleton testified that, based on his review of the affidavits, he thought that adult offenders would have been able to see the youthful prisoners in the day room awaiting their interviews with the AAGs. Further, because prisoners are always expected to comply with staff requests, Stapleton opined that the youthful prisoners would not have felt free to refuse to attend the interviews. (*Id.* at Pg. ID 1767.) On cross-examination, Stapleton admitted that he did not believe that the prisoners would have been issued a misconduct ticket for refusing to talk with the AAGs. (*Id.* at Pg. ID 1774.) He also conceded that aside from the inferences he drew based on the

affidavits, he had no personal knowledge of the events of the AAGs' interviews.

Plaintiffs also called Dr. Terry Kupers, a psychiatrist, to testify regarding cultural and social dynamics that exist in a prison environment, and their effect on the prisoner witnesses the AAGs interviewed. Dr. Kupers opined that: "The interviews by the Assistant Attorney[s] General[] were in direct violation of every single point in the protocol for interviewing a person who's potentially been the victim of the sexual assault." (*Id.* at Pg. ID 1819.) When asked to specifically identify what the AAGs did incorrectly, he stated that the interviews were too short, that the AAGs did not transparently disclose what the purpose of the interview would be, and that the coercive environment of the prison would have influenced the prisoner's decision to speak with the AAGs. Dr. Kupers also testified that the AAGs erred by directly asking the prisoners whether they had been sexually assaulted; instead, the AAGs should have allowed each prisoner to self-direct the interview and discuss whatever topics the prisoner felt appropriate. (*Id.* at Pg. ID 1810, 1830.) Dr. Kupers stated that the AAGs should have started each interview with the assumption that every prisoner was a victim of sexual assault. (*Id.* at Pg. ID 1808.) Because of the flaws in the process the AAGs used, he suggested that the interviews "would be very unlikely to uncover the truth." (*Id.* at Pg. ID 1845.)

Plaintiffs also presented the testimony of three prisoners whom the AAGs interviewed. By the parties' mutual consent, all three proceeded pseudonymously. Prisoner One was one of the prisoners interviewed by the AAGs. He stated that he was called to the control center, but was not told why. (*Id.* at Pg. ID 1890) When he arrived at the control center, he waited with a few other prisoners. (*Id.* at Pg. ID 1890–91.)

Eventually a MDOC staff member called him into a room where he met with AAG Schneider. (*Id.* at Pg. ID 1892.) Prisoner One said that he did not understand that AAG Schneider was an attorney, but his impression was that AAG Schneider worked for MDOC. (*Id.* at Pg. ID 1893.) Prisoner One testified that he lied to AAG Schneider, and falsely told him that he had not been sexually assaulted. (*Id.*) Prisoner One further testified that, in fact, he had been forced at knifepoint on two occasions to perform oral sex on a group of adult prisoners in the shower. (*Id.* at Pg. ID 1894–97.) Prisoner One agreed that he had been given a chance to review and edit the affidavit presented to him by AAG Schneider, and that he signed it despite knowing that it was false. (*Id.* at Pg. ID 1898.)

Prisoner Two also signed, but now repudiates, an affidavit presented after an interview with AAG Schneider. Prisoner Two stated that a correctional officer told him that the interview "had to do with the ACLU juvenile lifer lawsuit," and he assumed that the individual conducting the interview was from either the ACLU or the State Appellate Defender Office. (*Id.* at Pg. ID 1906.) When he entered the interview room, Prisoner Two testified that AAG Schneider identified himself as an attorney, but did not say who he represented. (*Id.* at Pg. ID 1908.) However, Prisoner Two did not ask AAG Schneider who he was or what the purpose of the interview would be. (*Id.* at Pg. ID 1926–27.) Prisoner Two told AAG Schneider that adult prisoners had made sexual advances to him, but did not disclose that he had, in fact, been molested by a much older inmate. (*Id.* at Pg. ID 1909, 1912.) Prisoner Two stated that he did not tell AAG Schneider about this assault because he was uncomfortable and unfamiliar with AAG Schneider. (*Id.* at Pg. ID 1913.)

4

Plaintiffs presented Prisoner Three, who testified that on the day of the interview, corrections officers told him that he had an attorney visit. (*Id.* at Pg. ID 1935.) Prisoner Three identified AAG Farrell as the attorney who conducted the interview, and stated that AAG Farrell told him that he was "here to represent" Prisoner Three. (*Id.* at Pg. ID 1936.) He told AAG Farrell that his adult cellmate assaulted him with a knife and forced him to perform sexual acts. (*Id.* at Pg. ID 1937.) Prisoner Three further testified that when he told correctional officers about the assault, they did not take action. (*Id.* at Pg. ID 1939.) He recalls that AAG Farrell wrote down Prisoner Three's experience, but did not allow him a chance to read or edit the statement. (*Id.* at Pg. ID 1941.)

Plaintiffs' final witness was Professor Linda Mullenix, a law professor who teaches courses in civil procedure and class action practice and procedure. Professor Mullenix opined that the AAGs should have contacted Plaintiffs' counsel to seek counsel's consent prior to conducting interviews, and that the AAGs also should have jointly sought a protective order from the court. (Dkt. # 103, Pg. ID 1979.) She also stated that the AAGs erred by not informing the inmates that their "interests were adverse" to the state. (*Id.* at Pg. ID 1982, 1984.) Professor Mullenix further opined that the court should issue a protective order governing communications with putative class members and prohibit the use of any of the affidavits for any further purpose in this litigation. (*Id.* at Pg. ID 1994.)

AAG Cori Barkman, one of the attorneys who conducted the interviews, testified for Defendants. She stated that the purpose of the interviews was to find out who potential witnesses were for Plaintiffs' case, and to ascertain whether there was any truth to Plaintiffs' claims. (*Id.* at Pg. ID 2036–37.) She further stated that she asked

5

each interviewee whether he was already represented by counsel in a civil case regarding their conditions of confinement, and whether the interviewees were willing to speak with her. (*Id.* at Pg. ID 2037.) Because of logistical concerns, AAG Barkman and her fellow AAGs began utilizing different form affidavits that allowed prisoners to confirm whether they had been the victims of sexual assault, and if so, to provide details. (*Id.* at Pg. ID 2041–42.) AAG Barkman stated that she never asked a prisoner not to sign a confidentiality agreement or not to speak to Plaintiffs' counsel. (*Id.* at Pg. ID 2043.) She also testified that she always identified herself as an AAG who represented the MDOC in prisoner lawsuits. (*Id.* at Pg. ID 2045.) She allowed each prisoner to read the affidavit she prepared, and make any edits to it that he deemed necessary. (*Id.* at Pg. ID 2046.) If a prisoner asked AAG Barkman for clarification regarding whether she represented him, AAG Barkman informed him that she "absolutely [did] not." (*Id.* at Pg. ID 2055.) However, AAG Barkman did not tell the interviewees that her clients' interests may be "adverse" to theirs unless they specifically asked her. (*Id.* at Pg. ID 2057.)

AAG Clifton Schneider was also one of the attorneys who conducted interviews with prisoners. AAG Schneider testified that he began each interview by asking whether the prisoner was currently represented by an attorney in any civil case involving the conditions of the prisoner's confinement. (*Id.* at Pg. ID 2117.) Next, he informed the prisoners that he was an attorney representing the MDOC and that he was investigating a lawsuit where prisoners are complaining about sexual assaults. (*Id.* at Pg. ID 2120–21.) Like AAG Barkman, AAG Schneider denied ever asking a witness to sign a confidentiality agreement or telling him to avoid speaking with Plaintiffs' counsel. (*Id.* at Pg. ID 2122.) AAG Schneider prepared affidavits, and each prisoner reviewed the

affidavit for accuracy before he signed it. (*Id.* at Pg. ID 2123.) AAG Schneider remembers that he told Prisoner Two who he was and that he represented the MDOC—he denied telling Prisoner Two that he was from the State Appellate Defender's Office or from the ACLU. (*Id.* at Pg. ID 2130.) If a prisoner asked AAG Schneider what the affidavit would be used for, AAG Schneider explained that it might be used later on if he were to change his story. (*Id.* at Pg. ID 2146.)

Defendants presented AAG James Farrell as their final attorney witness. AAG Farrell testified that from his perspective, it was critical to begin interviewing prisoner witnesses in order to ascertain whether there was systemic abuse throughout the MDOC. (*Id.* at Pg. ID 2180–81.) Again, like AAGs Barkman and Schneider, AAG Farrell began each interview by asking whether the prisoner was represented by an attorney in a conditions of confinement case. (*Id.* at Pg. ID 2185.) He informed each prisoner that he was an AAG for the state of Michigan, and explained that he represented the MDOC. (*Id.* at Pg. ID 2186–87.) He further explained that he was investigating claims that juvenile prisoners were being sexually molested by adult prisoners, and asked each prisoner whether he had been the victim of a sexual assault. (*Id.* at Pg. ID 2188.) AAG Farrell denied telling any prisoners not to speak with Plaintiffs' counsel. (*Id.* at Pg. ID 2192.) Each prisoner read the pertinent affidavit before signing it. (*Id.* at Pg. ID 2194–95.)

Defendants also presented the testimony of several MDOC personnel. Corrections Officer Brent Winiarski testified that if a prisoner had refused to speak with the AAGs, he would not have been punished or issued a misconduct ticket for his behavior. (Dkt. # 103, Pg. ID 2082.) However, he did not inform the prisoners that they

could refuse the visit. (*Id.* at Pg. ID 2086.) Officer Winiarski further clarified that if he had been giving an inmate a direct order, he would have used the phrase "I'm giving you a direct order" so that the prisoner would know that compliance was mandatory. (*Id.* at Pg. ID 2106.) Assistant Resident Unit Supervisor Amie Orlandino also testified that there would have been no punishment for prisoners who refused to attend an interview, but like Officer Winiarski, she did not specifically inform the prisoners that they would not be punished for a refusal to attend an interview. (*Id.* at Pg. ID 2101, 03.)

## II. STANDARD

Under Federal Rule of Civil Procedure 23(d), the court has general authority to issue orders governing a potential class action. As the Supreme Court has recognized:

> Class actions serve an important function in our system of civil justice. They present, however, opportunities for abuse . . . Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.

*Gulf Oil*, 452 U.S. at 99–100. However, the court's discretion has bounds; by limiting speech, such orders can interfere with counsels' ability to defend or prosecute their case. *Id.* at 101. Therefore, "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. "[S]uch a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102. Among the potential abuses associated with intra-class communications are: "(1) the susceptibility of nonparty class members to solicitation amounting to barratry, (2) the

8

increased opportunities of the parties or counsel to 'drum up' participation in the proceeding, and (3) unapproved communications to class members that misrepresent the status or effect of the pending action." *Williams v. U.S. Dist. Court*, 658 F.2d 430, 436 (6th Cir. 1981).

Rule 26(c) covers similar ground and grants the court the power to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" for good cause shown by the moving party. *See* Fed. R. Civ. P. 26(c). "[T]o justify a protective order, one of Rule 26(c)[]'s enumerated harms must be illustrated with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012). As the party seeking the protective order, Plaintiffs bear the burden of showing good cause. *Methode Elec., Inc., v. Delphi Auto. Sys. LLC*, No. 09-13078, 2009 WL 3875980, at *1 (E.D. Mich. Nov. 17, 2009) (citing *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313–14 (11th Cir. 2001)).

The court should begin "with the premise that, other things being equal, a defendant *does nothing wrong* by communicating directly with someone who may become, but is not yet, a member of a class." *Zwerin v. 533 Short North, LLC*, No. 2:10-cv-488, 2011 WL 2446622, at *2 (S.D. Ohio June 15, 2011) (emphasis added); *see also Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1225 (S.D. Ala. 2008); *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1084–85 (C.D. Cal. 2002). District courts from around the country have agreed that the moving party must show both that: (1) a particular form of communication has occurred or is threatened to occur, and (2) that the communication is abusive and threatens the proper functioning of the litigation.

9

*See, e.g., Zwerin*, 2011 WL 2446622, at *2; *Longcrier*, 595 F. Supp. 2d at 1226–27; *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697–98 n.2 (S.D. Ala. 2003) (collecting cases). "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Cox*, 214 F.R.D. at 698.

### III. DISCUSSION

Plaintiffs argue that Defendants' engaged in "abusive practices" by interviewing juvenile prisoner witnesses regarding Plaintiffs' allegations of sexual assault by adult prisoners and MDOC personnel. Plaintiffs claim that following the filing of their complaint, AAGs visited MDOC facilities and ordered juvenile prisoners to be brought in for witness interviews. According to Plaintiffs:

> During these interviews, without notice of the AAGs' adverse interests, and without notification of their potential legal rights in the current action, the youth were questioned regarding their personal experience with sexual assault in prison. Without notification of their legal rights, assurances of confidentiality, or that their testimony would not lead to retaliation, the incarcerated minors were then directed to sign fill-in-the-blank affidavits, written in legalistic language, which would either confirm or deny whether they had been sexually victimized during their term of imprisonment.

(Dkt. # 101, Pg. ID 1685.) Plaintiffs seek a broad protective order that would:

> 1. Bar Defendants from conducting any discovery with putative class members without at least 3 days' notice to Plaintiffs' counsel who would have a right to attend any and all meetings with putative class members;
>
> 2. Require Defendants to submit for Plaintiffs' review, and the court's approval, any communication that Defendants propose sending to any putative class member;

> 3. Require Defendants to prepare a written notice to all putative class members and prisoners witnesses that would, *inter alia*, identify Defendants as an adverse party, advise the prisoner that he is not required to meet with or speak to Defendants, provide contact information for Plaintiffs' counsel, and advise prisoners that they could not be disciplined for refusal to participate in an interview with Defendants.

(*See* Dkt. # 101, Pg. ID 1703–05.)

As noted above, the court begins "with the premise that, other things being equal, a defendant does nothing wrong by communicating directly with someone who may become, but is not yet, a member of a class." *Zwerin*, 2011 WL 2446622, at *2. Attorneys frequently engage in a wide range of activities when preparing a case for litigation, including conducting interviews with potential third-party witnesses. Thus, in order to justify a protective order, Plaintiffs must show that Defendants' interviews were abusive and that they threatened the proper functioning of this litigation. *Id.* Plaintiffs have not met this burden.

Plaintiffs extensively cite Dr. Kupers's testimony as establishing that the manner in which Defendants conducted their prisoner interviews was coercive. On this point, Dr. Kupers identified several flaws with Defendants' interview methodology, specifically that: (1) the interviews were not long enough to establish trust and rapport between the AAGs and the prisoners, (2) Defendants erred by asking direct questions about sexual abuse, (3) the prison setting is inherently coercive, and (4) that Defendants did not transparently disclose their purpose for the interviews and the purpose for which the interviews would be used. Because of these flaws, Dr. Kupers opined that the interviews "would be very unlikely to uncover the truth." (Dkt. # 102, Pg. ID 1845.) The court views Dr. Kupers's testimony with a measure of skepticism. The court has little

doubt that Dr. Kupers's suggested techniques are effective in the therapeutic setting in which he practices psychiatry. However, it is no more than an assumption that these same needs translate effectively or efficiently to preparation for litigation. Put another way, while a therapeutic setting may emphasize the patient and the patient's comfort, interviews of the sort conducted by Defendants have another goal in mind—finding out what (if anything) happened, when, where, and to whom.

For example, Dr. Kupers testified that when interviewing a potential victim of sexual assault, the interviewer must take pains to conduct the interview in a free-ranging and open-ended format. But this concept applied to a litigation investigation becomes untenable. The court is doubtful that Defendants would have discovered much, if anything, by summoning each prisoner-witness into a room and inviting him, in general and in a non-directed way while wearing kid gloves, to discuss his experience in prison. Such a technique, perhaps suitable for psychiatric therapy, would predictably result in a massive amount of information—little of it relevant to the instant litigation.

To the extent that Dr. Kupers and Richard Stapleton testified that the prison setting is "inherently coercive" because prisoners would have felt compelled to speak with the AAGs on threat of disciplinary action, the court notes that no evidence was presented that any prisoner interviewee was ever disciplined as a result of Defendants' actions. Indeed Officer Winiarski and Assistant Resident Unit Supervisor Orlandino testified that if any prisoners had refused to meet with the AAGs, they would not have been subject to disciplinary measures. Absent any evidence of a prisoner who refused to cooperate and was subsequently punished by MDOC personnel, the court finds Plaintiffs' argument in this regard to be vague and conclusory speculation. *See Serrano*

*v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012).[1]

Plaintiffs also argue that Defendants' failure to inform the prisoner interviewees of their "adverse interests" and of the current litigation rendered the interviews coercive. First, the court finds no credible evidence suggesting that the AAGs concealed their motives or misrepresented their identities. AAGs Schneider, Barkman, and Farrell are all licensed members of the Michigan bar in good standing. To this point, the court begins with the presumption, as it does with all counsel, that the AAGs conduct themselves with honesty and candor. Absent any credible evidence supporting the extraordinary accusation that the AAGs lied about or concealed their representation of the MDOC, the court does not find any reason to doubt that their testimony is truthful.[2]

It is also worth noting that none of the prisoner witnesses presented to the court testified that the AAGs lied to them regarding their identity or their purpose for conducting the interviews. Prisoner One testified that he did not understand that AAG

---

[1] Moreover, as Defendants argue, the Supreme Court has held that the mere fact that a prisoner is questioned in a prison setting does not render the interview coercive. "[Q]uestioning a prisoner in private does not generally remove the prisoner from a supportive atmosphere. Fellow inmates . . . may be hostile and, for a variety of reasons, may react negatively to what the questioning reveals. . . . Isolation from the general prison population is often in the best interest of the interviewee and, in any event, does not suggest on its own [an] atmosphere of coercion[.]" *Howes v. Fields*, 132 S. Ct. 1181, 1191–92 (2012).

[2] *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1225 (S.D. Ala. 2008), is factually distinct. In *Longcrier*, the defendant employer admitted to using the pretext of conducting a "survey" to obtain employee declarations regarding the defendant's pay practices. *Id.* at 1227–29. In contrast, the AAGs disclosed their representation of MDOC and the purpose of the interviews as conducting an investigation into allegations of the abuse of juvenile prisoners. The AAGs did not use a pretext to obtain interviewee participation, and *Longcrier*'s severe remedy of striking all of the declarations obtained by the defendant is therefore inappropriate in this case.

Schneider was an attorney, but that his impression was that AAG Schneider worked for the MDOC. (Dkt. # 102, Pg. ID 1893.) Prisoner Two stated that a correctional officer told him that the interview "had to do with the ACLU juvenile lifer lawsuit," but did not attribute these statements to AAG Schneider. (*Id.* at Pg. ID 1906.) He also testified that he did not ask AAG Schneider who he represented, or what the purpose of the interview was. (*Id.* at Pg. ID 1926–27.) Although the testimony of Prisoners One and Two leave the court with the impression that there may have been some understandable confusion by uneducated youthful prisoners regarding the identity of the AAGs' and purpose of their visit, it does not support a finding that the AAGs acted inappropriately.[3]

Plaintiffs also presented testimony and argument suggesting that the AAGs should have informed each prisoner interviewee that, as representatives of the MDOC in the current litigation, the AAGs' interests were adverse to that of the prisoner's. However, as the AAGs testified, a fixed state of "adversity" is not necessarily true. The conclusion that there exists an adversity of interest, Defendant-to-interviewee, depends on an assumption that each prisoner witness is either the victim of a sexual assault, or a witness who is afraid to come forward for fear of retaliation from the MDOC. Plaintiffs' argument in this regard is supported by Dr. Kupers's testimony that the AAGs should have started each interview with the assumption that every prisoner was a victim of

---

[3] Prisoner Three claimed that AAG Farrell did not allow him a chance to read or edit the affidavit he signed and that AAG Farrell claimed to represent Prisoner Three. (Dkt. # 103, Pg. ID 1936, 41.) If these allegations were true they would be concerning, but the court credits AAG Farrell's testimony that this incident did not occur.

14

sexual assault.  (*Id.* at Pg. ID 1808.)   However, it is equally plausible that many of the prisoner witnesses' interests are *not* adverse to Defendants' position; some prisoner witnesses may have no information to provide, some prisoner witnesses may not have been the victims of sexual assault, and some may have information that directly contradicts Plaintiffs' claims.  Defendants have a right —and an obligation to their clients— to investigate these issues and ascertain which prisoners fall into which categories.  The AAGs' practice of asking each interviewee whether he was currently represented by counsel in a conditions of confinement case, as well as their notification to each prisoner that they were attorneys who represented the MDOC, sufficiently notified the interviewees of the *potential* for divergent interests, leaving it to the individual interviewee to decide whether or not he wished to continue the interview or sign an affidavit memorializing his statement.

As part of their motion, Plaintiffs seek an order from the court directing Defendants' counsel to inform all prisoner witnesses of the instant litigation, as well as the possibility that they might be a class member.  This disclaimer would include a form advertising the identity of Plaintiffs' counsel, providing the "name, phone number, JPay account and physical address of Plaintiffs' counsel" and explaining "that any prisoner has a right to contact Plaintiffs' counsel after speaking with Defendants."  (Dkt. # 101, Pg. ID 1703–05.)  Incentives, of course, work both ways:  Dr. Kupers conceded that while the possibility of punishment might influence prisoners to inaccurately deny sexual assaults, the possibility of a monetary reward (such as may be provided through a class action judgment) might also influence prisoners to untruthfully report that they had been sexually assaulted.  (Dkt. # 102, Pg. ID 1876.)  As easily as the threat of punishment

15

could deter a putative class member from truthfully reporting his claim, the promise of reward could encourage another prisoner to concoct a false claim, thereby threatening the proper function of the instant litigation.

The court did not find Professor Mullenix's testimony particularly helpful. Professor Mullenix started with the proposition that the best practice would have been for Defendants, prior to holding any prisoner interviews, to contact Plaintiffs to inform them of Defendants' intention and mutually craft a protective order. (Dkt. # 103, Pg. ID 1979.) However, as Defense Counsel pointed out in closing arguments, this assumption begins with the premise that a protective order is necessary. And a protective order is appropriate *only* where there exists a demonstrated need to protect against abuse. *Gulf Oil*, 452 U.S. at 101–02. In other words, Professor Mullenix's starting point presumes abuse, and begins with the remedy. The professor's cart precedes her horse. It bears repeating: a defendant (or plaintiff, for that matter) does *nothing wrong* by communicating directly with someone who may be, but is not yet, a member of a class. *Zwerin*, 2011 WL 2446622, at *2; *Longcrier*, 595 F. Supp. 2d at 1225; *Parks*, 235 F. Supp. 2d at 1084–85. True, a protective order is needed once a party has shown good cause that an abusive communication has occurred or is threatened to occur, but only then. *Zwerin*, 2011 WL 2446622, at *2; *Longcrier*, 595 F. Supp. 2d at 1226–27; *Cox*, 214 F.R.D. at 697–98 n.2 (S.D. Ala. 2003). And as stated *supra*, Plaintiffs have not met this burden.

In summary, the court credits the testimony of AAGs Barkman, Schneider, and Farrell, and finds that the precautions they took in conducting the interviews adequately protected the interests of putative class members. These measures included:

16

ascertaining whether each interviewee was already represented by counsel in a conditions of confinement case and discontinuing the interview if the interviewee answered in the affirmative, disclosing their identity as AAGs and their representation of the MDOC, allowing each interviewee the chance to fully state their relevant knowledge and to read and edit an affidavit before signing it, and allowing the interviewees the ability to decline to sign an affidavit or speak with the AAGs without disciplinary repercussions.

The court is aware of the possibility that certain interviewees may have falsely denied sexual abuse because of a lack of trust between the interviewees and the AAGs, fear of negative repercussions resulting from such a disclosure, or a host of other, more personal, reasons. A witness interview (and a resulting affidavit) are only as persuasive as the witness himself and the questions asked. It may be that some interviewees will belatedly disclose incidents of sexual assault as this case proceeds and sign later affidavits recanting earlier sworn statements. Such a war of competing affidavits is hardly uncommon in federal court, and ultimate issues of witness credibility are determinations entrusted to a jury. However, this case is still in the earliest of stages—a scheduling order has not yet been issued and discovery has not yet commenced in earnest. Based on the facts currently before it, the court is not convinced that Plaintiffs' proposed broad protective order is necessary.

## IV.  CONCLUSION

IT IS ORDERED that Plaintiffs' motion for a protective order (Dkt. # 61) is DENIED.

      s/Robert H. Cleland
    ROBERT H. CLELAND
    UNITED STATES DISTRICT JUDGE

Dated:  August 1, 2014


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 1, 2014, by electronic and/or ordinary mail.

      s/Lisa Wagner
    Case Manager and Deputy Clerk
    (313) 234-5522